# United States Court of Appeals
## For the First Circuit

Nos. 06-1887, 06-1888

UNITED STATES OF AMERICA,

Appellee,

v.

OTILIO CARRASCO and
KELLEY MALA,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Chief Judge,

Lipez and Howard, Circuit Judges.

Thomas R. Lincoln for appellant Otilio Carrasco.
Anita Hill Adames for appellant Kelly Mala.
Mariana E. Bauzá-Almonte, Assistant United States Attorney,
with whom Rosa Emilia Rodriguez-Vélez, United States Attorney,
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, and Germán A. Rieckehoff, Assistant United
States Attorney, were on brief, for appellee.

August 28, 2008

**HOWARD**, **Circuit Judge**.  Otilio Carrasco and Kelley Mala[1] were arrested after a search of Mala's 21-foot boat revealed 47 kilos of cocaine and 170 grams of heroin, more or less.  They were convicted by a jury, and each now appeals on a variety of grounds. Finding error below, we vacate and remand.

## I. Facts[2]

### A. The Arrest

The two men and a companion[3] were traveling from the United States Virgin Islands to Puerto Rico in a 21-foot boat. Marine Enforcement Officers of the United States Customs Service hailed the boat off the coast of Puerto Rico, in customs waters. It took a little longer than usual for the boat to come to a complete stop and get into a position where it could be boarded. The officers then boarded the boat, demanding identification and conducting a document and safety inspection.  Everything was in

---

[1]  Mala's first name is spelled two different ways in the record. We adopt the spelling Mala uses to sign his many pro se filings.

[2]  Facts adduced at trial are set forth in the light most favorable to the verdicts.  United States v. Girouard, 521 F.3d 110, 113 (1st Cir. 2008).  Facts related to the suppression hearing are explored in more detail.  The district court did not make specific findings of fact about the circumstances surrounding the confessions.  Nor were these issues before the jury.  We will note differing accounts of these events.

[3]  The traveling companion was not charged in this case, but was found to be in the United States illegally and was deported.  Mala claims the government failed to preserve testimony by deporting her, but that contention is without merit and we make no further mention of it or her.

order, but a search of the boat revealed drugs hidden in two toolboxes, in a backpack and in a shoebox within the wheel housing of the boat. Everyone aboard was arrested and taken to an Immigration and Customs Enforcement Marine Enforcement office.

Accounts of what happened at the Marine Enforcement office differ, but some facts are undisputed. Mala and Carrasco each produced a signed, written confession -- Mala's was in his own handwriting, Carrasco's was transcribed by an agent.[4] Mala also produced a note in his own handwriting. The note is addressed to Carrasco and advises him to cooperate with authorities. Also undisputed is that a DEA agent from the Virgin Islands, one Hilary Hodge, was in telephonic contact with Mala before any statement was given. No record of the conversation was made, nor was Hodge available to testify. It was after this telephone conversation that Mala produced first his statement and then the note to Carrasco. The note was delivered to Carrasco, and he apparently read it. Carrasco's statement was taken shortly thereafter.

## B. The Hearing

The district court held a hearing to resolve two suppression questions. The defendants challenged the search of the boat as violative of the Fourth Amendment, and they challenged the

---

[4] As discussed below, Carrasco at trial denied making the statements memorialized in the confession, but he did acknowledge that he signed the confession.

confessions as involuntary.[5]  At the hearing, Mala testified but Carrasco exercised his Fifth Amendment privilege against self-incrimination.  The government produced as witnesses several law enforcement officers who had been at the Marine Enforcement office.

At the suppression hearing, conflicting evidence was presented regarding consent to the search.  Government witnesses testified that they confirmed that Mala was the owner and operator of the boat, and that he consented to the search.  They testified that Mala became nervous as the search shifted to the stern of the boat, but never withdrew his consent.  Mala, on the other hand, testified that he was not asked for his consent to the search, nor did he give it.  In a later docket entry, the district court found that Mala had made a valid consent to the search, and that in any case the search qualified as a border search and therefore consent was unnecessary.

Testimony differed, too, about the circumstances surrounding the confessions.  According to testimony from the government's witnesses, Mala was allowed outside with two law enforcement agents to smoke cigarettes.  While the three men were outside, one of the agents spoke by cellphone with Hodge.[6]  Hodge asked to speak to Mala and was permitted to do so.  After the brief

---

[5]  Mala moved to suppress the confessions as coerced, and Carrasco joined the motion to suppress.

[6]  The government witnesses did not remember if the call originated with Hodge or with one of them.

conversation, Mala got off the phone and indicated he was ready to make a statement. He confessed his guilt in a signed, handwritten statement and asked to speak to Carrasco. The agents would not allow it, in accordance with their normal procedure, but they did permit Mala to send Carrasco a note. The note in essence said that the jig was up and that Carrasco should cooperate with law enforcement. Carrasco then dictated a statement of his own.

Again, Mala's testimony differed substantially. In his version of events, he repeatedly asked to call his lawyer and his family, but was rebuffed. He was then told someone wanted to speak with him, and he was handed a cellphone. Hodge spoke, although he did not identify himself, and Mala, never having met Hodge, did not recognize the voice. Hodge told Mala they knew all about him and threatened to seize Mala's businesses and other property in the Virgin Islands, as well as Mala's parents' property, if he did not cooperate. Hodge also threatened to have Mala's mother, who had title to the boat, arrested as part of the conspiracy. Mala handed the phone back to an officer, who spoke to Hodge for a few moments and laughed before hanging up. Shaken by the threats, Mala asked for a cigarette, even though he does not smoke cigarettes. He smoked two or three. During this interlude, an officer repeatedly asked him if he would make a statement. But when Mala wrote down what had happened, and the statement reflected his innocence, the officer said that it was not good enough and threw the statement in

the trash.  As part of a deal with the agents, Mala testified, he created a false confession and the note to Carrasco in order to trick Carrasco into confessing.

On cross-examination at the hearing, the government confronted Mala with his previous felony conviction for smuggling cocaine.  Mala conceded that he had the conviction on his record, but countered that he had been sentenced to time served in a plea arrangement that had come about because the government could not prove he had been a knowing participant.

The district court ruled that the confessions would be suppressed, citing sloppy police work, the unavailability of Hodge to testify about the phone call, and inconsistencies between the agents' testimony and other evidence.  The district court said, "[A]ll that's going to come before the jury when we try this case is the fact that these people were stopped and they were found with this cocaine in a 21-foot boat. . . .  And if he takes the stand you'll impeach him with this conviction."  The government asked if the confessions could be used as impeachment should either defendant take the stand and testify inconsistently with them.  By way of answer, the district court said,

> This is sloppy police work.  I don't like the way Mr. Hodge dealt with this issue.  It is entirely possible [Mala] felt he had to wheel and deal and he turned back and sent all these notes to the agents to give to the other guy. The agents should never have allowed this to happen.  Maybe these statements are the whole truth, but maybe they are not.  And I don't

care what happened other than the fact that they were caught red-handed on a 21-foot boat with this cocaine and heroin. And it is going to be very difficult to explain to a jury. It is as simple as that and that is what we are going to try in this case.

## C. Trial

At trial, Carrasco, against the advice of his attorney, took the stand.[7] He testified that he had no knowledge of the drugs in the toolboxes. He said an acquaintance named Jose had asked him to deliver tools to Jose's brother in Puerto Rico. Mala adopted Carrasco as his own witness and elicited further testimony: Carrasco alone had loaded the toolboxes, backpack and shoebox on the boat; Mala had at no time opened the containers or been apprised of their contents. The government, out of hearing of the jury, asserted that because of Carrasco's inconsistent testimony it was within its rights to use the confession for impeachment. Mala's counsel objected, saying the confessions had been ruled

-----

[7] At trial, Carrasco had new court-appointed counsel; they had first met a week prior. Counsel was presumably familiar with the transcript of the suppression hearing summarized above, but she did not represent Carrasco there. At sidebar before Carrasco testified, counsel told the district court that she had warned Carrasco that if he testified inconsistently with his prior statements, they would be used to impeach him. Although the government argues that Carrasco cannot have been prejudiced because he was warned the confession might be admitted to impeach him, we cannot credit this line of reasoning. Given that counsel's admonition did not reflect the record at the time, and that Carrasco had been very involved in his own defense, we cannot say with certainty that Carrasco believed the warning. We further note that if Carrasco did believe that the district court would admit the statement, but believed that it would do so in error, his only way to challenge the error would have been to take the stand.

-7-

involuntary.  The district court said, "Impeachment is a different story," and allowed the government to proceed.[8]  Carrasco, confronted with the confession, denied making the statements it contained, but acknowledged his signature and his initials on the document.  The jury returned guilty verdicts.

## II. Discussion

Appellants raise a host of issues, both through counsel and pro se.  We will treat three claims in some detail.[9]  First, each appellant claims that the district court erred in allowing the fruits of the search into evidence.  Second, each appellant, pro se, claims that the evidence was insufficient to convict him of either charge.  And third, each man challenges the admission of Carrasco's confession as impeachment evidence.  We find no merit in the first two of these claims, but the third requires us to vacate the convictions and remand for a new trial.

### A. The Search

Appellants moved to suppress the contraband, claiming that they did not consent to the search and that the district court

---

[8]  The district court addressed the issue of admissibility for impeachment again the following morning, asserting that an order in the docket explicitly allowed the confessions to be used in this manner.  As discussed below, the docket does not reflect any such order.

[9]  The rest we summarily dismiss as either insufficiently developed or without merit.

erred in its alternative determination that the search met the requirements of a border search.

When assessing the denial of a motion to suppress, "[w]e review the court's findings of fact for clear error and its application of the law to those facts de novo." United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008). Put another way, "we will uphold the district court's decision if any reasonable view of the evidence supports the decision." United States v. Materas, 483 F.3d 27, 32 (1st Cir. 2007) (citation and internal quotation marks omitted).

The Fourth Amendment protects the right of the people to be secure against unreasonable searches and seizures of their persons, houses, papers and effects. However, when consent is given by someone with sole or common authority over the place to be searched, the reasonableness inquiry is foreclosed. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). Further, so long as law enforcement officers reasonably believe that the person who gives consent has the authority to do so, they may rely on that consent. United States v. Meada, 408 F.3d 14, 22 (1st Cir. 2005).

The district court credited the testimony of law enforcement witnesses that consent was given, over Mala's testimony that it was not. While appellants might wish for a different result, they are not entitled to one. "[A] district court's choice between two plausible, but conflicting, interpretations of a

factual scenario cannot amount to clear error." <u>Valentin</u> v. <u>Hosp.</u> <u>Bella Vista</u>, 254 F.3d 358, 367 (1st Cir. 2001). Nothing in the evidence received shows that the district court's finding of fact was clearly erroneous.

Carrasco also claims that because the containers were entrusted to him alone, Mala could not give a valid consent for their search. This premise is flawed. We have held that officers may rely on consent given by someone who has apparent authority to consent to the search. <u>Meada</u>, 408 F.3d at 22. Here, there is no indication in any testimony that the authorities had any reason to believe that Mala lacked authority to consent to the search of the containers. The district court credited the testimony of law enforcement officers who said they identified Mala as the owner and operator of the boat. The containers were not locked, nor were they identified as Carrasco's personal property. Further, neither Carrasco nor Mala indicated at the time of the search that the containers were not Mala's. Without any contrary information, the searching officers had a reasonable belief that Mala possessed authority to consent to the search.[10]

_____

[10] Because we uphold the district court's determination that consent was given on which law enforcement could reasonably rely, we need not address the separate conclusion of the district court that the search was a border search.

## B. The Sufficiency of the Evidence

Appellants claim that the jury did not have sufficient evidence before it to convict them and that the district court therefore should have granted their motions for judgment of acquittal. Although the case is a close one, we disagree.

Because appellants moved for judgment of acquittal, our review is de novo. United States v. Piesak, 521 F.3d 41, 44 (1st Cir. 2008). To conduct that review, we consider the evidence in the light most favorable to the verdict, drawing all reasonable inferences so as to support it. Id. If a reasonable jury could have found that the government had proven each element of the crime beyond a reasonable doubt, we will affirm the conviction. Id.

The jury heard evidence that a large quantity of drugs was found on a small boat, of which Mala was the captain. Carrasco testified that he himself had loaded these containers onto the boat. The jury also heard testimony to the effect that Mala was reluctant to stop the boat for the Marine Enforcement officers, and that he became nervous when the officers' search shifted to the stern of the boat, where the drugs were hidden.[11] The jury heard testimony that none of the containers were locked or secured, and

---

[11] Although there was some conflict in the testimony, the jury would be entitled to credit one witness over another. In keeping with our standard of review, we present the strongest case that could be made out from the evidence at trial.

that the heroin, in particular, was in the wheel housing, to which the pilot of the boat would have ready access.

Appellants rely on the principle that mere presence at the scene of a crime is not enough to establish culpability beyond a reasonable doubt. But this is not mere presence.[12] First, the boat was under Mala's command. Further, the jury could have reasoned that Mala's reluctance to stop his boat indicated guilty knowledge. Even if he was not in on the scheme from the beginning, the jury might have reasoned, he might well have opened the containers or insisted on knowing what was inside them, given their large size and the lack of available space on the boat. Nor can Carrasco claim mere presence: he told the jury himself that he loaded the containers onto the boat.

"[J]uries may reason that a captain normally knows what his ship contains." United States v. Steuben, 850 F.2d 859, 865 (1st Cir. 1988). While this maxim does not dispose of Mala's challenge to the sufficiency of the evidence against him, it does present a formidable barrier. In this case the maxim is particularly apt: the boat was small and the cargo was large, and the jury could reasonably infer that Mala might have discovered its nature through inquiry, insistence or even inadvertence, if he did not know from the beginning.

---

[12]   See United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) ("[A] defendant's 'mere presence' argument will fail in situations where the 'mere' is lacking.").

-12-

We have often considered when a jury may reasonably infer that a crewman or passenger on a boat had knowledge that the boat also carried drugs.  See, e.g., United States v. Guerrero, 114 F.3d 332, 342 (1st Cir. 1997); United States v. Piedrahita-Santiago, 931 F.2d 127, 131 (1st Cir. 1991); United States v. Mehtala, 578 F.2d 6, 9 (1st Cir. 1978); United States v. Francomano, 554 F.2d 483, 487 (1st Cir. 1977).  "We have previously looked to factors such as the closeness of the crew's relationship, the length of the voyage, the size and condition of the vessel, the quantity of [drugs aboard], and the absence of a legitimate purpose for the voyage." Guerrero, 114 F.3d at 342.  A crew with close relationships, on a long voyage, in a small vessel or one that is suited to drug smuggling (or ill-suited to anything else), on a trip without a legitimate purpose, is more likely to be a crew that has knowledge of the drugs aboard.  Here, the voyage was brief, and the boat was not of a sort or in a condition that would arouse suspicion.[13]  On the other hand, Carrasco had worked for Mala before; he was not a sailor hired off the dock or a youth in search of adventure and experience.  Cf. Francomano, 554 F.2d at 486-76.  Moreover, the large quantity of drugs and the small size of the boat make it more likely that both of the men would have known or would have discovered the nature of the cargo.

---

[13]  Additionally, there was, according to Carrasco's testimony, a legitimate purpose for the trip.

In addition, we acknowledge that these factors, not exhaustive in any case, are less applicable to the facts of this case, amounting to a short jaunt in a craft suitable for personal transportation. Francomano and Mehtala, by contrast, concerned a 70-foot schooner. Mehtala, 578 F.2d at 7 n.4. Guerrero concerned a 40-foot boat, one that had been heavily modified to make it more suitable for smugglers. Id. at 342 (makeshift extra fuel tanks crudely welded to the deck, boat modified to ride low in the water to avoid detection, sophisticated radar and communications gear). The situation we confront in this case is much less like an eighteen-wheeler on a long haul and much more like a quick joyride across town in the family car. In any event, the jury could reasonably have inferred that either or both men knew of the contents of the toolboxes, the backpack and the shoebox. For each, something more than mere presence supports knowledge of the drugs: Mala was captain of the boat; Carrasco testified to moving the toolboxes himself. Because the jury could have inferred that both men knew of the drugs, it could also have inferred that appellants had agreed to transport them to Puerto Rico for the purpose of distributing them, which is the essence of the conspiracy charge. The evidence (even without the confessions) was sufficient to convict appellants, and the district court did not err in denying the Rule 29 motions.

## C. Carrasco's Confession

Appellants claim that the district court erroneously admitted Carrasco's confession to impeach his testimony at trial. Their argument is not that the confession was inadmissible per se, but that the district court, in admitting the confession, contradicted its earlier ruling.

We focus on two issues: the district court's initial statement -- which the government concedes was made -- that Carrasco's confession could not be admitted to impeach him; and whether that ruling rests on a finding of involuntariness. The outcome of the suppression hearing was somewhat unclear, but due to the government's concession at oral argument we regard it as settled that the statement was to be suppressed for impeachment purposes.

Indeed, this is the only plausible interpretation of the district court's ruling at the hearing. In asserting at trial that it had ruled the confessions admissible for impeachment, the court stated that it had specifically noted in a docket entry that use for impeachment would be permitted. The district court referred defense counsel to this docket entry, saying that counsel could not therefore claim unfair surprise when the statement came in for impeachment.[14] Neither the government nor we have located such an

---

[14] The district court said,
> Then I made a ruling afterwards, in a motion saying that it extended to impeachment by the

entry.  The government conceded at oral argument that the district court must have been mistaken about the docket entry and in its belief that it had previously ruled the confession admissible for impeachment purposes.  On appeal, therefore, it no longer is contested that the court entirely excluded Carrasco's confession from evidence.

Nevertheless, the concession that the statement was inadmissible for impeachment does not resolve the question of whether the confession had been ruled involuntary.  Clearly, the district court did not believe so, or constitutional principles would have prevented the material from being used to impeach a defendant.[15]  The district court asserted at trial that the suppression of the confessions was a sanction to the government and not a ruling that they were involuntary.[16]  But the reasons the district court gave at the suppression hearing do reflect a concern about voluntariness.  As we note above, the district court said, "It is entirely possible [Mala] felt he had to wheel and deal."  We

statements. . . . I wrote it in a docket
entry, in a specific motion that if they would
testify I would allow the impeachment.

[15]  Confessions ruled involuntary may not be used to impeach a defendant who has testified inconsistently with them.  Mincey v. Arizona, 437 U.S. 385, 397-98 (1978).

[16]  The desire to punish the government for not producing a witness is not in any event a valid basis for suppressing evidence. This case provides an object lesson in the confusion that results when the district court makes rulings based on considerations other than the merits.

-16-

need not resolve this ambiguity in the record, for even assuming, arguendo, that the district court's initial ruling was not constitutional in nature, we discern reversible error, nonetheless.

Because each man stands in a slightly different position with regard to the confession and the course of events at trial, we consider each appeal separately.

i. Carrasco

Carrasco's counsel did not object to the district court's sudden reversal or the government's use of Carrasco's confession at trial. Because even plain error review brings us to the conclusion that his conviction must be vacated, we do not decide whether another standard would be more appropriate in the unique circumstances of this case.[17]

"To establish plain error, a defendant must show the existence of (1) an error; (2) that is plain; (3) that affected his substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Henry, 519 F.3d 68, 71 (1st Cir. 2008) (citations omitted); see also United States v. Olano, 507 U.S. 725, 732

---

[17] The use of an involuntary confession is reviewed to see if the error was harmless beyond a reasonable doubt. Arizona v. Fulminante, 499 U.S. 279, 310 (1991). The erroneous admission of other kinds of inadmissible evidence is generally reviewed for prejudice to the party protesting its use. See United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993). We need not choose between these standards, as plain error review is a higher bar than either.

(1993). The error with which we concern ourselves is the district court's admission of Carrasco's confession after previously ruling it inadmissible.

Failure to abide by previous rulings about admissibility of evidence may be error, especially where there has been reliance. See United States v. Gonzalez-Maldonado, 115 F.3d 9, 15 (1st Cir. 1997) (district court's reversal of earlier ruling that expert testimony would be admitted was error). To be sure, the district court has authority to reconsider its rulings. See Fernández-Vargas v. Pfizer (Parent Corp.), 522 F.3d 55, 61 & n.2 (1st Cir. 2008). But that is not what happened here. The district court did not reconsider, but rather misremembered, its ruling. The result was an about-face on a crucial ruling, when a defendant had already testified and counsel was powerless to rethink trial strategy. The court was also mistaken that a docket entry addressed the subject. The contrast between the record and the district court's recollection is plain and obvious.

Carrasco must also show that his substantial rights were affected by the error. Olano, 507 U.S. at 734. He "must show a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." United States v. Colon-Nales, 464 F.3d 21, 27 (1st Cir. 2006) (internal quotation marks and citations omitted). He does not have to prove that it is

more likely than not that the error changed the verdict, however. United States v. Dominguez Benitez, 542 U.S. 74, 83 n.9 (2004).

Carrasco's defense attacked the government's assertion that he knew the drugs were in the containers. And this was a close case. When a verdict is supported by overwhelming admissible evidence we will not find plain error in the erroneous admission of other evidence. See, e.g., United States v. Richardson, 515 F.3d 74, 83-84 (1st Cir. 2008); United States v. Munoz-Franco, 487 F.3d 25, 57 (1st Cir. 2007); United States v. Rivera-Rivera, 477 F.3d 17, 20 (1st Cir. 2007). Although there was circumstantial evidence, there was hardly "overwhelming" admissible evidence. Carrasco was one of three people on a very small boat with a large quantity of drugs hidden in containers he loaded onto the boat. But there was no evidence of guilty knowledge on his part during the stop and search, no corroboration from anyone else that Carrasco knew there were drugs in the containers, no physical evidence linking him to the inside of the containers.

The government could have relied on the jury to make the permissible inference that Carrasco knowingly possessed the drugs. United States v. Azibuke, 504 F.3d 30, 37 (1st Cir. 2007) ("[T]his court has recognized that a reasonable inference of knowledge arises when the defendant is trusted with possession of a large amount of drugs. This is because drug organizations do not usually take unnecessary risks by trusting critical transactions to

-19-

outsiders."). While permissible, the inference is not compelled by the mere fact of his possession of the containers. We do not say that no jury could have convicted Carrasco on the admissible evidence, but there is a reasonable probability that the district court's error altered the result.

The district court changed its ruling after Carrasco had testified; his decision to testify is for him alone, and is itself a crucial piece of trial strategy. And a confession is no ordinary piece of evidence. "[T]he defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." Bruton v. United States, 391 U.S. 123, 139 (1968) (White, J., dissenting); see also Fulminante, 499 U.S. at 296 ("A confession is like no other evidence."). Regardless of the ultimate admissibility of the confession itself, it is certain that consideration of the earlier ruling would have influenced trial strategy. The closeness of the case and the crucial importance of the question of the confession's admissibility lead us to conclude that Carrasco's substantial rights were affected by the district court's error.

Finally, even when the first three prongs of the plain-error test are met, we will decline to correct an error unless it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Olano, 507 U.S. at 736. After all, "there are many fair trials, but few perfect ones." United States v.

Rainieri, 42 F.3d 36, 45 (1st Cir. 1994). The role of plain error review is not to insist on perfect trials, but rather to safeguard against unfair trials. Here, the district court's mistake about its earlier ruling "seriously affects the fairness, integrity, or public reputation of judicial proceedings."

Carrasco's Sixth Amendment right to conduct his defense was hobbled by the district court's eleventh-hour decision to admit his confession. Carrasco had already testified when the district court ruled the statements admissible. We are aware that suppression of a confession, even when the defendant testifies inconsistently, might appear to be a license to commit perjury in one's own defense. But that does not justify surprising the defendant, after his testimony, with words previously ruled inadmissible.

Further, Jackson v. Denno, 378 U.S. 368, 377 (1964), entitles the defendant to a "reliable determination on the issue of voluntariness." According to the record, there was no determination of the voluntariness issue at all.[18] Carrasco might be forgiven for not insisting on an explicit ruling at the hearing: when the confession was ruled inadmissible for impeachment the

_____

[18] A ruling that the confession would be admissible for impeachment might also imply a ruling that the confession was not coerced. But that is not the situation we confront, and we have no call to rule on the adequacy of such an implicit ruling. Here, the confession was, as the government concedes, ruled inadmissible for impeachment initially.

-21-

question was effectively moot. But resurrecting, mid-trial, the possibility of admission for impeachment once more placed this issue center-stage. It is clear from the way matters unfolded that Carrasco never received the ruling on voluntariness to which he was entitled. And that raises the specter of basic unfairness in the trial: Jackson explicitly rests on due process concerns that it is fundamentally unfair to allow the government to use confessions extracted by coercion. Id. at 384-88. "[T]he method used to extract [coerced confessions] offends constitutional principles." Lego v. Twomey, 404 U.S. 477, 485 (1972) (citations omitted). These constitutional principles are themselves concerned with "fairness" and "integrity."

On a more basic level, too, there is something disconcerting about this error. The district court is usually expected to abide by its own evidentiary rulings. Should a district court wish to reconsider a ruling, it may do so, although it should account for reliance on the previous ruling. But that is not what happened here. The district court misremembered its own ruling. Trial judges, like appellate judges, are fallible human beings. Errors are therefore to be expected. But allowing such an error to go uncorrected even though it may well have meant the difference between conviction and acquittal would certainly erode public confidence in the integrity of judicial proceedings.

Because the district court plainly misremembered its own ruling and the state of the docket, and because the admission of Carrasco's confession to impeach him may have made the difference between his conviction and his acquittal, we must vacate Carrasco's conviction.

## ii. Mala

Mala's counsel raised a seasonable objection to the use of Carrasco's confession. It is true that counsel did not utter the words "I object," but it is equally apparent from the record that Mala's counsel was the only person at sidebar who accurately remembered the ruling at the suppression hearing or the state of the record. In such a situation, further objection would clearly have been futile. The district court was on notice that Mala objected to the admission of the testimony, and the reason for the objection. The district court even offered a justification -- albeit an incorrect one -- for the ruling the following day. We therefore review the proceeding below to determine whether Mala suffered prejudice because of the error. See Fed R. Crim. P. 52(a). "[A] harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's

resolution of a material issue." Sepulveda, 15 F.3d at 1182. In other words, to determine harmlessness, "we ask whether we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"[19] United States v. Del Rosario, 388 F.3d 1, 10-11 (1st Cir. 2004) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

As with Carrasco, the case against Mala is a close one. It is true that the captain of a boat may be found to have knowledge of the things on that boat. See Steuben, 850 F.2d at 865. But under the circumstances we do not find that to tip the balance. Government witnesses conceded at trial that the containers were closed and that they had no reason to believe Mala had opened them. It is true that the admission of Carrasco's statement as impeachment evidence was probably less damaging to Mala than to Carrasco himself. But the confession also directly implicated Mala, and was read to the jury without redaction. The confession was introduced for impeachment purposes, but the district court did not give an instruction explicitly limiting its use to that purpose. Without regard to whether the confession ultimately should have been admitted, it is clear that Mala was deprived by the earlier ruling and the district court's sudden

---

[19] As discussed above, we assume without deciding that the district court's initial ruling that the confession would be suppressed was not based on a finding of coercion.

-24-

change of mind of the opportunity to argue that the confession be redacted or other measures taken to avoid the use of the confession for other purposes.

The government argues that Mala could have cross-examined Carrasco after the impeaching confession was admitted and thereby mitigated or eliminated any prejudice in the district court's about-face. But that ignores the reality of the trial: Mala had already adopted Carrasco as his witness and conducted an examination. Any hostile examination of Carrasco would have been inconsistent with that and would have run the risk of confusing the jury. Counsel at oral argument described the last-minute reversal of the earlier ruling as "devastating" to her defense of Mala, and we agree.

We cannot say with fair assurance that the district court's reversal of its own ruling -- with no consideration for the reliance of the parties, and after the defendant had already testified -- did not sway the jury to convict. We must therefore vacate Mala's conviction as well.

### III. Conclusion

We **affirm** the district court's denial of the motion to suppress the evidence seized after the search of the boat, we **affirm** the denial of appellants' motions for judgment of acquittal, and we **vacate** the convictions and **remand** for a new trial consistent with this opinion.

-25-